**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-CA-00718-COA**

SCOTT WILLIAMS                                                                    APPELLANT

v.

LANA ELIZABETH WILLIAMS                                                          APPELLEE

DATE OF JUDGMENT:                    05/22/2024
TRIAL JUDGE:                         HON. RHEA HUDSON SHELDON
COURT FROM WHICH APPEALED:           LAMAR COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:              CAMERON LEIGH BENTON
ATTORNEY FOR APPELLEE:               MICHAEL V. RATLIFF
NATURE OF THE CASE:                  CIVIL - DOMESTIC RELATIONS
DISPOSITION:                         AFFIRMED IN PART; REVERSED AND
                                     REMANDED IN PART - 01/27/2026
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. Scott Williams appeals from a Lamar County Chancery Court's judgment of divorce and contempt. Scott initially sought a fault-based divorce against his wife, Lana Williams, who counterclaimed for a divorce as well. The court issued a temporary order, and both parties filed motions for contempt against each other for violations of that order. The court bifurcated the fault issue from the property division issues, setting each for different trial dates. A month before the trial on the fault issue, Scott moved to add an additional ground. At the beginning of the trial, the court denied the motion to amend, and Scott presented his evidence in support of his claim for divorce. At the end of Scott's case, Lana moved to dismiss, which the court took under consideration. In a written order, the court later granted

the motion to dismiss and held that Scott failed to prove a fault ground for the divorce.

¶2. Just before court reconvened to hear proof on Lana's counterclaim for divorce, the parties agreed to a divorce on the ground of irreconcilable differences. They requested that the court rule on the division of marital property, the motions for contempt, and attorney's fees. After the court entered its judgment granting the divorce and resolving these matters, Scott appealed. On appeal, he raises the following issues: (1) whether the chancellor erred in denying his motion to amend his fault-based divorce pleading; (2) whether the chancellor erred in refusing to admit and consider testimony of marital fault resulting in his complaint for a fault-based divorce to be dismissed; (3) whether the chancellor failed to give proper consideration to Scott's proof of habitual cruel and inhuman treatment; (4) whether the chancellor erred in dividing the marital debt; (5) whether the chancellor erred in its contempt findings; (6) whether the chancellor erred in it distribution of the parties' closely held business; and (7) whether the cumulative errors of the chancellor warrant a new trial. After reviewing the arguments of counsel and relevant precedent, we affirm in part and reverse and remand in part.

**Facts and Procedural History**

¶3. Scott, age forty-four, married Lana, age thirty-one, in 2017. Both had children from prior relationships. Lana's three children were younger and lived with them in a home in Hattiesburg, which Scott had purchased prior to the marriage in his own name. When they married, Scott worked in construction, often out of town, and Lana worked at Wesley Medical Center and then at Cosmetics Plastic Surgery Clinic performing ultrasounds. Lana

had also started a business, Stork Secret I, in September 2016, where she performed ultrasounds and sold children's clothing and gifts. Stork Secret I, located in Hattiesburg, was successful, and Lana opened a second store in D'Iberville (Stork Secret II) with a third-party investor.

¶4.     Until April 2018, Scott worked outside the home, but then he stopped his construction work. He claimed Lana did not want him out of town so much and that she wanted his help with the children and her business. He also started a carpet cleaning business with his son, which he said failed because Lana's business and the needs of the children took precedence.

*Divorce Complaint and Answer*

¶5.     The parties separated on April 19, 2022, when Scott claimed he learned that Lana had twice sought abortions during the marriage. This alarmed him because Scott had previously undergone a vasectomy and could not have children. On May 17, 2022, Scott filed for divorce on the grounds of habitual cruel and inhuman treatment, habitual drunkenness, and irreconcilable differences.

¶6.     On June 21, 2022, Lana answered Scott's complaint and counterclaimed for divorce and temporary relief. She asserted that she had not become pregnant or undergone any abortions during the marriage. She cited habitual cruel and inhuman treatment, constructive desertion, habitual drunkenness, and irreconcilable differences as grounds for divorce.

*Temporary Order*

¶7.     On September 20, 2022, the chancery court issued a temporary order, giving Lana temporary use and possession of the marital home and ordering her to pay the monthly

3

mortgage. Scott was ordered to ensure that Lana had direct access to the online mortgage account so that payments could be timely made. Lana was given temporary use and possession of a Jeep Grand Cherokee along with responsibility for the monthly note and insurance. Scott was given use and possession of a Jeep Gladiator on which he would maintain insurance. Lana was ordered to pay the notes on that vehicle for June, July and August 2022, and Scott would begin paying the monthly note on September 1, 2022. The court gave Scott the temporary use and possession of the parties' boat and ordered him to pay the notes and insurance. Lana was allowed to continue to operate the Hattiesburg Stork Secret I store, and Scott was prohibited from entering or coming onto its premises. Lana also would continue to oversee the operations of the D'Iberville store. Scott and the third party owner were given access to the D'Iberville Stork Secret II store and access to business accounts, sales reports, and tax returns, but they could not make any withdrawals from that store's business accounts. Scott was also ordered to secure employment and was restrained from harassing Lana. The court set June 27, 2022, as the date of demarcation for purposes of accumulation of marital assets. The court signed and entered the written order which included these conditions on September 20, 2022, nunc pro tunc to June 27, 2022.

*Interim Order and Motions for Contempt*

¶8.     The parties engaged in discovery, and on January 2, 2023, the court heard the motions to compel filed by each and a motion for contempt that Lana had filed on September 21, 2022.[1] The court's resulting interim order noted that although Lana was given the use and

_____

[1] The motion was not included in the record.

4

possession of the home, mortgage payments had not been made, and the mortgage was placed into a forbearance period from May 2022 through December 2022. The court ordered Scott to remit one month's payment to Lana and ordered Lana to pay the rest and bring the account current. The parties told the court that several of the other contempt issues had been resolved, and the court held the unresolved contempt matters in abeyance.

¶9. On April 12, 2023, Scott filed a motion for contempt and for modification of the temporary order. Scott alleged that he sent Lana a check for one month's mortgage payment on March 2, 2023. The check was cashed, but Scott later learned that the home entered into foreclosure in April. In addition to Lana failing to pay the mortgage, Scott alleged that Lana had failed to pay the Jeep Grand Cherokee note as well and that the Jeep had been repossessed. Scott further asserted that Lana had sold the boat that Scott had been awarded under the temporary order and kept the sale proceeds. Finally, Scott alleged that Lana failed to complete and file tax returns as ordered by the court. Scott asked that the court modify the temporary order to give him the use and possession of the marital home to secure it financially and avoid further deterioration of the parties' creditworthiness.

*Motion to Amend*

¶10. On April 13, 2023, Scott filed a motion to amend his divorce complaint to include uncondoned adultery as a ground for divorce, claiming that he had intended to raise the allegation when he filed his original complaint.[2] Although trial was set for May 17, 2023, Scott alleged that he would not oppose any request for a continuance Lana filed, and he

_____

[2] Scott had retained new counsel in the interim.

5

personally filed his own motion for a continuance that same day. On May 5, 2023, Lana responded in opposition to Scott's motion to amend, alleging that the trial, which had been set for a year, would have to be continued and that further discovery would be needed, which would cause unreasonable and prejudicial delay of the matter.

¶11. Lana also filed a motion to dismiss Scott's contempt motion under Mississippi Rule of Civil Procedure 12(b)(6) and a motion for Rule 11 sanctions. She asserted that Scott had failed to provide her with online access to the accounts in his name so she could make the house and vehicle payments required of her. She also sought reimbursement for two boat insurance payments that Scott had been required to pay that had been debited from her account.

¶12. The court and the parties met on May 8, 2023, for a pre-trial conference. According to Scott's May 16, 2023 response to Lana's motion for sanctions, following the May pre-trial conference, the parties and their attorneys called the mortgage company and confirmed that Lana had access to the mortgage account and could have made the payments required. The parties ultimately arranged for a HUD loan of $28,004.95 to cover the amount owed, which was paid through their mortgage company and tacked to the end of the mortgage.

¶13. Scott noticed his motions for contempt, for modification, for leave to amend his complaint, and for a continuance for a hearing on May 17, 2023, the first day of trial.

*Trial*

¶14. On May 17, 2023, the court considered Scott's motion to amend his complaint to include adultery as a ground. After hearing the parties' arguments, the court denied the

6

motion as untimely.

¶15.	The court proceeded to hear Scott's case for divorce. Scott began by testifying that he worked in construction in Meridian when he and Lana met. She did not want him on the road, so he left that job. Scott said they were starting businesses, including the carpet cleaning business and Stork Secret I, and his job was to help with the businesses and with the kids. His own two children were adults, and Lana had three minor children (two girls and a boy). Scott said he knew it was hard on the kids with their parents being divorced, so he wanted to be a "good guy that got along with them."

¶16.	Scott said that his and Lana's relationship started to decline when he asked Lana if she had had an abortion. At first, Scott testified that Lana denied it and offered to hire a private investigator to prove it. Scott said he wanted to believe her because something like that would ruin their reputation and affect their Stork Secret business, which offered free sonograms to women who were uncertain about their pregnancy. But later in his testimony, Scott testified that Lana admitted to him that she did have an abortion. Scott said that she could not have conceived his child because he had had a vasectomy.

¶17.	Scott testified that Lana handled all the family finances, which put some pressure on the relationship because before they married, he was used to handling his own money. Now he had to ask Lana if he needed or wanted money for anything. She allegedly controlled his life, telling him what he would do each day, controlling the finances, and belittling him if he made a mistake. Scott entered into evidence Facebook messages between him and Lana. At one point, he blocked her calls, and she texted and threatened to cut off his phone. Scott also

7

entered photos and a video he took of his face that showed scratches Lana made during an argument. He submitted another video he took of them arguing about a rental car he had been given when his car was being serviced. Scott agreed that Lana paid individuals, Kelly Blackwell and Michaela Williams, to pick up the kids after school if he could not. He said he drove a 2022 Jeep Rubicon Gladiator that cost him $58,000 or $60,000. It was financed in his name because Lana said she needed to finance the ultrasound machine.

¶18. Scott's next witness was his cousin by marriage Tammy Hobby. She said she saw Scott and Lana frequently; they spent Christmases together and went on vacations together. She would visit at Scott and Lana's home about once a month. Tammy said that Scott had performed quality control work and was always working. He saved up his money to buy the house. Tammy confirmed that Lana didn't like Scott "going off on the road." Tammy said she and Lana became close and that Lana wanted Scott to start a business or something so he could work locally. Lana talked about possibly restoring furniture, that her own business was not doing well, and that Scott was still having to pay for everything because her ex-husband was behind on child support. Tammy also testified Lana told her that she had cheated on Scott, that she hated herself for it, but that God forgave her, and it would never happen again.

¶19. Scott next called Jimmy Hobby, Tammy's husband. He testified to visiting Scott's house prior to the separation. He confirmed that he and Tammy and even Scott's son were unable to call Scott on the phone because Lana was blocking calls. But if she wanted to speak to Scott, Lana would unblock it and speak to him. Jimmy felt this was her controlling

Scott, just like she handled the money.

¶20. Scott then called four employees to testify. One, Gracie Necaise, worked at the D'Iberville Stork Secret II store for two and a half years. She testified that she had concerns the last few weeks when she worked at the Hattiesburg store because Lana came in twice, drinking mimosas in a Yeti cup. Michaela Williams, Scott's niece, testified that at work one day during COVID-19, she knocked over a cup that Lana had been drinking from, and it smelled of alcohol. On cross-examination, Michaela testified that Lana paid her to babysit her children early in the marriage when Scott was still working in Meridian. She would pick up the children from school because both Lana and Scott were working. Michelle Feck, the manager of the Hattiesburg store until November 2021, testified that about three months before she left, Lana started bringing in a man and sending Scott off on appointments. Lana's attorney objected, and the court ruled it would not hear any testimony concerning alleged adultery. Michelle also said Lana often consumed alcohol and that she (Michelle) would go to the liquor store to purchase it. Lana drank champagne mimosas, not every day, but "randomly."

¶21. The last employee witness, Sarah Gilmore, had worked at the Hattiesburg store. She testified that in the beginning of April 2019, she and Lana went to Jackson to pass out business cards at the abortion clinic. Sarah said she stayed in the car, waiting about forty minutes while Lana was inside. She said she did not know anything about Lana having an abortion—all she knew was they were going to Jackson to pass out business cards at the clinic. However, Sarah admitted there were texts between her and Lana about Lana getting

9

an abortion, but Lana was not pregnant. "There was no baby, so there was no abortion." Sarah said she told Scott that they had gone to Jackson, but she insisted there was no baby, stating, "I didn't physically help her get an abortion because there was no child." However, Sarah also said that Lana told her about having a "pregnancy scare," but Sarah claimed she knew nothing about Lana going to get an abortion.

¶22. Scott called his daughter, Chelsea Littlefield, who testified about an incident concerning her own son and how she learned of Lana and Scott's separation. Scott also called his son, Cameron Williams, who had lived with Scott and Lana for several months from the end of 2020 through early 2021. Cameron said that Scott was taking Lana's children to school at that time, and both Lana and Scott were working in the businesses. His father would have to ask Lana for money or if they could purchase something. After the separation, Scott had little money. So Cameron had to buy Scott gas and help with food. Cameron also testified that Scott had lost his "QC" (quality control) certifications because he had been out of the business so long.

¶23. Scott's last witness was Britain Novanon, who met Scott when she moved to McLain as a small child in 2001. Scott had lived in McLain prior to moving to Hattiesburg. Novanon bought Scott's trailer when he moved into his home. She did not know Lana personally. Britain testified that Lana "was with" one of Britain's good friends when Lana was married to Scott, the implication being that Lana was having an affair. Britain said that she learned this from that friend, not Lana, and the court sustained Lana's objection to the testimony as hearsay.

10

¶24.   After Scott rested, Lana moved to dismiss his complaint, arguing that Scott had failed to prove, by a preponderance of the evidence, that her behavior either endangered his life or created a reasonable apprehension of such danger, rendering the relationship unsafe.  The court took the motion under advisement and adjourned for the day.

*June 2023, August 2023, and September 21, 2023 Orders*

¶25.   On June 12, 2023, the chancery court entered an order granting Lana's motion to dismiss Scott's complaint for divorce.  The court reviewed the testimony Scott presented and found that Scott had failed to present credible proof to substantiate the fault grounds he had pleaded.

¶26.   On August 10, 2023, the chancellor signed an order, nunc pro tunc to May 17, 2023, in which the court ordered that the Stork Secret businesses be professionally valued and ordered  that the parties agree on an expert, or submit recommendations to the court for the court to appoint one.  The court further appointed Becky Ladd to appraise the marital home.  The court then set trial dates in November 2023 for the continuation of the trial on the merits of Lana's complaint, for property valuation, and on the contempt issues remaining.

¶27.   On September 21, 2023, the court appointed Robert D. King to perform the business evaluation and ordered each of the parties to pay $2,500 for his services.  On November 7, 2023, the court continued the case, resetting it for trial on February 27, 2024, and compelled Lana to pay her half of King's fee.  As of January 8, 2024, Lana had not paid her share of the fee, and Scott filed a motion for contempt against her.

*Parties' Voluntary Dismissal of Fault Grounds*

¶28. On February 24, 2024, Scott and Lana signed an "Irrevocable Consent Agreement and Stipulation of Issues in Irreconcilable Differences Divorce." In it, they agreed to dismiss their fault grounds and identified the issues that they could not agree upon, including the division of the marital estate, alimony, issues of contempt raised by each of the parties, and attorney's fees. The parties also signed a "Joint Motion to Dismiss Fault Ground[s]." The motion reviewed the two complaints that the parties had filed against each other and stated, "[T]he parties ask the [c]ourt to dismiss the fault grounds alleged in the Complaint and Counterclaim." Both Lana and Scott, as well as their attorneys, signed the motion. They all also signed an agreed order that was presented to the court granting the motion, dismissing the fault grounds, and allowing them to proceed on the alternative ground of irreconcilable differences.

*Resumption of Trial*

¶29. On February 27, 2024, the court reconvened and was presented with the irrevocable consent agreement, the motion to dismiss the fault grounds and proceed on grounds of irreconcilable differences, and the agreed order the parties had signed. The court signed the order and confirmed that the parties were voluntarily dismissing their fault-based claims against each other. The court stated that it would proceed to hear testimony on the remaining issues of the division of the marital property and contempt motions. The court made it clear that it would not consider fault in dividing the marital property, though fault was a factor that could be legitimately considered under *Ferguson v. Ferguson*.[3] In this case, the parties had

---

[3] In *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), the Mississippi Supreme Court set out eight factors that the court is to consider in attempting to equitably

12

dismissed their fault grounds, making fault irrelevant in the division of their property. The court proceeded to hear testimony on the remaining issues.

¶30. Scott testified that under the temporary order, Lana had use and possession of the home that he had purchased in 2016 in his name alone. The balance owed on the home to Rocket Mortgage was $232,892.78, along with a note to HUD in the amount of $28,004.95. This separate note was incurred to bring the account current when Lana had gotten behind on the payments. According to the appraisal ordered by the court, the home was valued at $350,000. Scott further testified that the 2021 Jeep Grand Cherokee, which had been financed in his name, had been repossessed and sold, and $19,628.07 was still owed on it. Scott explained that Lana had taken classes at the University of Southern Mississippi on how to start a business, and he helped her start Stork Secret I. According to the business appraisal ordered by the court, Stork Secret I was valued at $10,400. Scott testified that he completed most of the inside work on the store with assistance from Lana's father. Scott said that Lana did not have any money at the time because she had gone through a divorce, was not getting child support, and was just making ends meet. So he paid for everything. Scott said Lana did not want him working on the road, and their plan was to build the businesses together. He said he co-signed for the ultrasound machine.

¶31. Scott testified that when the Stork Secret stores were in operation, he picked up supplies, ran errands, dropped off the children at school, mailed and shipped packages, and

---

divide marital property. Under the first *Ferguson* factor, the Mississippi Supreme Court has held that "[m]arital misconduct is a viable factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

took clothing to be monogrammed. He said he discussed marketing with Lana and how to make the business grow. Because Lana insisted on his not working out of town and her needs, he turned down job opportunities. As a result, when he stopped doing that kind of work, he lost his certified welder's inspection license, which required him to work a certain number of hours in the field. Scott testified that in the temporary order, he was given the boat, but Lana sold it without his knowledge or permission. It was his understanding that in the sale, the note was paid off. Scott asked the court for the home, the lawnmower, the tractor, and the bed, as well as alimony.

¶32. As of the date of the trial, Scott said he was working temporarily on the construction of an ammunitions plant in Tennessee as a field engineer and quality inspector. But the job would be over in a few months. Currently, his employer was providing him housing, and paid him $11,653 gross (net $9,253.95), along with a $100 per day per diem. He had no garnishments "yet," but he knew he owed $19,628.07 to Ally on the Jeep that was repossessed. He drove a Jeep Gladiator Rubicon with a loan balance owed to Chrysler Credit of $43,740.75. Scott said he owed Keesler Federal Credit Union about $10,000 and Trustmark Bank $150 per month on credit cards. He said Lana used his name and purchased a hot tub from Wayfair that he was paying $200 per month for.

¶33. On cross-examination, Lana's attorney pointed out that her name alone is shown as the owner of Stork Secret I. Scott stated that he was unaware of this, and he was trying to get to the bottom of everything about the ownership of the businesses. Scott denied ever refusing to work up front at the stores or saying that was not "a man's job." He also denied

14

changing the passwords to the electronic accounts so that Lana could not pay the house and Jeep notes. Scott stressed that when Lana's attorney kept saying that "she paid" to have the children picked up, really it was the businesses that paid the cost and the businesses were jointly owned. When he was on the Gulf Coast tending to the business, he could not pick up the children, so someone had to. Scott agreed that Lana obtained a loan for Stork Secret I, but he denied that she paid off his credit card debt. He said he tried to start a cleaning business with his son to have another stream of income, but he never got to run it like it should have been run because Lana had him doing things for Stork Secret. Because the cleaning business never made money, Lana wanted him to sell it.

¶34. After Scott rested, Lana testified. She said she never told Scott to refuse any jobs. She stated that at Stork Secret I, she performed ninety-nine percent of the ordering and ninety percent of the ultrasounds. Lana testified that she obtained a loan and used $40,000 from her previous marriage settlement to open the business. Lana flatly denied that Scott worked for the business as he claimed. She said other than installing some flooring and making the front desk for the Hattiesburg store, for which she paid Scott, he did nothing else. When her manager called in sick, he refused to work at the front desk "because it was woman's work." When he would not help around the house, she had to pay others to do yard work, pick up the children, and clean. Lana said Scott did not want to work and spent his days riding the roads and visiting family and friends. From her point of view, Scott did nothing to help the Hattiesburg store.

¶35. Lana testified that after the first hearing when she was awarded the temporary use of

15

the home, Scott put the home into a forbearance program, and she was unable to make the mortgage payments. She explained the difficulty in making payments and how she had to call Rocket Mortgage, deal with automated responses, and then finally speak with a person to complete the transaction. She asked the court to be able to stay in the home until the end of the school year and then have the home sold and the profit split. Lana testified that the Jeeps were also in Scott's name, and when she and Scott were together, the payment was automatically drafted from her bank account. But Scott changed the password to the account and stopped the autopay, so she could no longer pay for the Jeep Grand Cherokee that she was temporarily awarded, causing it to be repossessed. She then had to purchase another vehicle (a Tahoe) to use. Lana also confirmed for the court that she and Scott each had separate Wayfair accounts.

¶36. Concerning items in the home, Lana testified that Scott was awarded the temporary use and possession of the boat, but he had to pay the note and insurance on it. After he missed two payments on both, she spoke to her attorney, who told her she could sell the boat. Lana said the boat and the account were in her name, so she could lawfully sell it, though she acknowledged that she did not ask the court's permission to do so. She did not profit from the sale because she sold it for the loan balance. Lana said the taxes could not be finished and filed because the D'Iberville store was still involved in litigation with the third party who held an interest in it. That person refused to sign documents to file the taxes.

¶37. Lana asked the court for alimony and for attorney's fees because she had offered to proceed with the divorce on a no-fault ground, but he insisted on having his day in court,

costing her a whole day of attorney's fees.

¶38.    At the conclusion of the testimony, the court asked the parties to each submit proposed findings of fact and conclusions of law.

*Opinion and Final Judgment*

¶39.    On May 22, 2024, the court issued its opinion and final judgment in the matter. The court reviewed the background and course of proceedings and began with the division of the marital property. The court had previously set the date of demarcation for the accumulation of marital assets as June 27, 2022, the effective date of the temporary order. The court created a chart of the parties' "marital assets subject to division," assigned values, and totaled the marital assets at $132,140. The court did the same for "marital debt," which, according to the court, totaled $378,100. The court listed the home as a marital asset but listed only the equity value in it ($88,323), not the appraised value of $350,000. The court included the entire balance of the mortgage owed on the home, $243,428, as a marital debt.

¶40.    The court then set out the *Ferguson* factors that it considered, including, the substantial contribution to the accumulation of the property; the degree to which each spouse has expended, withdrawn, or otherwise disposed of the marital assets or any prior distribution; the market and emotional value of the assets; the value of assets not ordinarily subject to distribution, such as property brought to the marriage; tax and other economic, contractual, or legal consequences owed by the parties; the extent to which property division may be utilized to eliminate periodic payments; the needs of the parties for financial security; and any other significant factor.

17

¶41. The court made factual findings for each *Ferguson* factor. The court found that both parties contributed to the accumulation of the assets. The court further noted that Lana sold the boat without Scott's knowledge, that she was unable to pay the Jeep Grand Cherokee note, and that the vehicle was repossessed. The court also noted that both Lana and Scott wanted to stay in the home. The court said it did not find the value of assets brought into the marriage to be a factor to consider, nor did the court consider the economic, contractual, or legal consequences of the property division to be a factor either. Concerning the parties' need for financial security, the court noted that Scott was employed as a field engineer and that Lana was employed as a cardiovascular ultrasound technician and owned Stork Secret I. The court took notice of a $200,000 judgment against Lana personally, which was the result of litigation brought by her investor.

¶42. The chancellor then proceeded to award Scott ownership of the marital home but awarded Lana $44,161.50 for her share of the equity accrued in the home, which Scott was ordered to pay by September 1, 2024. Lana was awarded ownership of Stork Secret I as well as the vehicles in her possession and various items of personal property. The court also made her solely responsible for payment of the debt on the Tahoe ($62,000), a 2014 Audi ($8,000),[4] several credit cards, and a Best Buy account. She was awarded $600 from a joint checking account. The court calculated the total award of her share of the marital assets to

---

[4] Neither party testified about the Audi. On her May 15, 2022 Rule 8.05 financial statement, Lana listed a 2014 Audi Q 7 registered in her name but driven by one of her children. *See* UCCR 8.05. Lana listed the loan balance at $8,000 but gave the vehicle no value. However, Lana did not list this vehicle in her February 2024 Rule 8.05 financial statement.

18

be $66,656.50.

¶43. The chancellor made Scott responsible for the payment of the remaining Rocket Mortgage house loan ($243,428), Chrysler Capital ($46,396), and other bank obligations. However, Lana was responsible for mortgage payments for May, June, and July 2024. She was to vacate the home by July 31, 2024. Scott was awarded $600 from the joint checking account, and one half of the value of Stork Secret I ($5,200). *See infra* note 9. The court reduced the amount Scott owed to Lana for her equity in the home by the $5,200 she owed him for his interest in Stork Secret. The court also awarded some personal items to Scott and valued his total award of the marital estate at $65,450.50.

¶44. The court further found that its distribution of the assets alleviated the need for alimony. The court proceeded to set out the law on issues of contempt and to determine whether either party had prevailed on their motions for contempt. The court noted that the parties had resolved several of the contempt issues prior to the hearing on January 3, 2023. Of the remaining issues Lana raised, the court only found merit regarding Scott's failure to pay the boat and automobile insurance payments he owed for the months of June and July 2022, causing $397.84 to be debited from Lana's account. Finding Scott in contempt for not reimbursing Lana for these payments, the court awarded her a $397.84 judgment, which Scott was ordered to pay before July 1, 2024.

¶45. Concerning Scott's motion for contempt, the court found that Lana's ability to pay the mortgage and the Jeep notes was taken away, and as a result, the Jeep was repossessed. Although her contempt was not willful, her inability to make the payments did not alleviate

19

her obligation to pay them. The court found it equitable for the parties to share the deficit balance owed on the Jeep after its repossession. Lana's share, $9,818.45, would be deducted from the award of equity in the home, as would another $9,500 for her failure to pay the mortgage payments she was responsible for. Therefore, Scott had to pay Lana only $19,643.05 for her equity in the marital home, which represented her equity, less his equity in Stork Secret, and credit for the contempt payments Lana owed.

¶46. After considering the *McKee* factors, *see McKee v. McKee*, 418 So. 2d 764 (Miss. 1982),[5] the court denied Lana's request for $7,140 in attorney's fees, finding that she was financially able to pay them. Further, the court denied both parties' request for attorney's fees for the contempt motions they filed because the court found them both in contempt.

*Appeal*

¶47. On June 21, 2024, Scott appealed, raising the following issues: (1) whether the chancellor erred in denying his motion to amend his fault-based divorce pleading; (2) whether the chancellor erred in refusing to admit and consider testimony of marital fault resulting in his complaint for a fault-based divorce to be dismissed; (3) whether the chancellor failed to give proper consideration to Scott's proof of habitual cruel and inhuman treatment; (4) whether the chancellor erred in dividing the marital debt; (5) whether the

---

[5] In *McKee*, 418 So. 2d at 767, the Mississippi Supreme Court held that the assessment of attorney's fees was within "the sound discretion of the trial court" and that the appropriate amount "depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case."

20

chancellor erred the contempt findings; (6) whether the chancellor erred in the distribution of the closely held business of the parties; and (7) whether the cumulative errors of the chancellor warrant a new trial.

**Standard of Review**

¶48.    "The findings of a chancellor in domestic relations matters will not be disturbed [on appeal] unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *O'Neal v. O'Neal*, 17 So. 3d 572, 574 (¶11) (Miss. 2009) (citing *Irby v. Est. of Irby*, 7 So. 3d 223, 228 (¶9) (Miss. 2009)). "Substantial, credible, and reasonable evidence is required to support a chancery court's factual findings." *In re Conservatorship of Geno v. Geno*, 365 So. 3d 287, 296 (¶23) (Miss. Ct. App. 2021).

**Discussion**

I.    **Whether the chancery court erred in denying Scott's motion to amend his fault-based divorce complaint, in excluding testimony of marital misconduct, and in failing to consider his proof of habitual cruel and inhuman conduct.**

¶49.    The first three issues Scott argues on appeal deal with rulings the chancery court allegedly made in considering the fault-based divorce complaint he filed. Specifically, he claims that the chancery court erred in denying his motion to amend to add uncondoned adultery as a ground, in not considering evidence from which Lana's adultery could be inferred, and in finding insufficient proof of habitual cruel and inhuman treatment. However, these issues were waived when Scott consented to a divorce on the ground of irreconcilable differences.

¶50.    A consent agreement to proceed on a divorce based on irreconcilable differences

21

"operates as a withdrawal and cancellation of any previously asserted fault-based grounds for divorce made by either party." *O'Neal*, 17 So. 3d at 577 (¶25). In *O'Neal*, the husband filed for divorce on the ground of habitual cruel and inhuman treatment. *Id.* at 573 (¶2). The wife answered and counterclaimed for divorce on grounds of cruel and habitual inhuman treatment and habitual drunkenness. *Id.* at (¶3). Both parties included irreconcilable differences as an alternative ground. *Id.* The parties then filed a consent agreement, agreeing to a divorce due to irreconcilable differences and setting out the issues to be resolved by the chancellor. *Id.* at (¶4). After the court's bench ruling on those issues, the parties both filed post-trial motions, on which the court did not rule. *Id.* at 57 (¶¶5-6). A year later, the wife filed a motion to set aside the judgment of divorce, arguing that the parties had not withdrawn the fault-based grounds as required by Mississippi Code Annotated section 93-5-2(5), which provided:

> Except as otherwise provided in subsection (3) of this section, no divorce shall be granted on the ground of irreconcilable differences where there has been a contest or denial; provided, however, that a divorce may be granted on the ground of irreconcilable differences where there has been a contest or denial, if the contest or denial has been withdrawn or cancelled by the party filing same by leave and order of the court.

The chancery court denied the wife's motion, and on appeal, the Mississippi Supreme Court affirmed, holding:

> [W]hen the parties fully and properly execute a mutual-consent agreement to a divorce based on irreconcilable differences, under the requirements prescribed by the Legislature in subsection (3), the Act establishes that the parties intend to and do withdraw all contests and denials. Thus, the consent agreement operates as a withdrawal and cancellation of any previously asserted fault-based grounds for divorce made by either party.

22

*Id*. at 577 (¶25). The Supreme Court cited its holding in *Irby*, 7 So. 3d at 237 (¶43), where the wife sought to set aside the court's no-fault divorce decree by arguing that despite entering into a consent agreement to divorce on the ground of irreconcilable differences, the parties never formally withdrew the fault grounds stated in their original pleadings. The chancery court rejected this argument, and the Mississippi Supreme Court affirmed, pointing out that each party voluntarily agreed to be bound by the court's decision and that the consent they granted could not be withdrawn by either party without leave of court. *Id*. at (¶46). The *O'Neal* Court noted that the irreconcilable differences statute "permits parties to bargain on the premise that reaching an agreement will avoid the necessity of presenting proof at trial." *Id*. at (¶49).

¶51.    In *Cossey v. Cossey*, 22 So. 3d 353 (Miss. Ct. App. 2009), we cited both *O'Neal* and *Irby*. There, the parties filed pleadings against each other, alleging grounds of adultery, desertion, habitual cruel and inhuman treatment, as well as irreconcilable differences. *Id*. at 355 (¶3). Then the parties filed a consent agreement, agreeing to a divorce on the basis of irreconcilable differences and setting out twenty-three areas of dispute for the chancellor to decide. *Id*. at (¶4). The husband appealed the chancellor's final judgment, arguing, among other things, that the court did not have the authority to grant the divorce because the parties did not withdraw their former fault-based claims. *Id*. at 356 (¶11). We rejected the husband's argument, citing *O'Neal* and *Irby*, and stated that these decisions make it exceedingly clear that no withdrawal of the fault-based grounds initially asserted was necessary. *Id*. at 357 (¶12).

¶52. "A court may decide contested issues in a divorce based on irreconcilable differences, but the court is limited to the resolution of those issues specifically identified and personally agreed to in writing by the parties." *Sanders v. Sanders*, 281 So. 3d 1043, 1052-53 (¶37) (Miss. Ct. App. 2019) (internal quotation marks omitted). In *Sanders*, the wife filed for divorce and the husband answered and counterclaimed for divorce and custody. *Id*. at 1048 (¶8). Ultimately, the parties withdrew their fault-based claims and consented to an irreconcilable differences divorce, leaving child custody and visitation to the chancellor to decide. *Id*. On appeal after the court's denial of injunctive relief, we held that any issue that was not specifically listed for the chancellor to decide was waived on appeal, including the husband's request for injunctive relief. *Id*. at 1052-53 (¶37). As precedent, we cited *Leblanc v. Leblanc*, 271 So. 3d 494, 509 (¶70) (Miss. Ct. App. 2019), where a party waived pending contempt issues by failing to specify them in her consent to an irreconcilable differences divorce.

¶53. In the case at hand, after Scott's unsuccessful attempt to prove fault grounds for a divorce, the parties signed an "Irrevocable Consent Agreement and Stipulation of Issues in Irreconcilable Differences Divorce." In it, they specifically stated that they were dismissing their fault grounds and then identified the issues they requested the court to decide. This document was not the only one the parties signed withdrawing their fault grounds; they also filed a "Joint Motion to Dismiss Fault Ground[s]" in which they asked the court to dismiss their fault grounds. They signed an agreed order that was presented to the court granting the motion, dismissing the fault grounds, and allowing them to proceed on the alternative ground

24

of irreconcilable differences. Clearly, by signing these documents, both Scott and Lana were abandoning the fault grounds they had pled.

¶54. Moreover, after dismissing Scott's complaint and hearing Lana's counterclaim for divorce, the chancery court was presented with the parties' signed irrevocable consent agreement and stipulation of issues for the court to decide. The chancellor reviewed the agreement on the record and signed the agreed order. Further, the court specifically stated that it would not consider the fault of the parties, one of the *Ferguson* factors used to determine the division of marital property, because Scott and Lana had voluntarily dismissed the fault grounds in their complaints. Scott did not object or preserve for appeal any of his fault grounds but dismissed them altogether. Then the court heard evidence concerning the remaining issues for resolution, i.e., the division of the marital property, the contempt issues, and attorney's fees request.

¶55. In light of clear precedent, we hold the issues of whether the chancery erred in not allowing Scott to amend his complaint and add another fault ground, or whether the court erred in excluding evidence of marital misconduct, were waived because Scott withdrew his claim for a fault divorce and consented to a divorce based on irreconcilable differences.

## II. Whether the chancellor erred in dividing the marital debt.

¶56. Although Scott raises two errors he claims the chancellor made in dividing the marital debt (the inclusion of the Tahoe debt as marital debt and the disproportionate share of the debt that the chancellor placed on him), in essence Scott challenges the overall equitable distribution of the assets and debts ordered by the court.

25

¶57.    "Equitable division of assets begins with the chancellor's classification of assets as marital versus non-marital." *Fleishhacker v. Fleishhacker*, 39 So. 3d 904, 907 (¶13) (Miss. Ct. App. 2009) (citing *Hemsley v. Hemsley,* 639 So. 2d 909, 914-15 (Miss. 1994)).  Marital property is all property acquired or accumulated during a marriage.  *Hemsley*, 639 So. 2d at 915.  Such assets are subject to equitable distribution unless the asset was owned before the marriage, was a gift or inheritance, or was acquired with separate funds.  *Id.*  However, assets and debts cease to be marital and become separate after a date set by the chancellor, known as the date of demarcation, which can be the date of separation (at the earliest) or the date of the divorce (at the latest).  *Collins v. Collins*, 112 So.3d 428, 431-32 (¶9) (Miss. 2013).

¶58.    "In dividing marital property, [c]hancellors must (1) classify the parties' assets and liabilities as marital or separate pursuant to *Hemsley*, (2) determine the value of the property, and then (3) divide the marital property equitably, employing the *Ferguson* factors as guidelines in light of each parties' separate property." *Thompson v. Thompson*, 380 So. 3d 945, 953 (¶31) (Miss. Ct. App. 2024) (internal quotation marks omitted).  The *Ferguson* factors include: "(1) contribution to the accumulation of the marital property; (2) dissipation of the assets; (3) the market or emotional value of assets subject to distribution"; (4) "[t]he value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse"; (5) "[t]ax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution"; "(6) the extent to which property division may eliminate the need for

26

alimony; (7) the financial security needs of the parties; and (8) any other factor that in equity should be considered." *Chapman v. Chapman*, 395 So. 3d 447, 456 (¶26) (Miss. Ct. App. 2024); *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). If one party is left with a deficit after the division of assets, the chancery court could then consider alimony based on the value of the nonmarital assets. *Sandoval v. Sandoval*, 89 So. 3d 77, 80 (¶8) (Miss. Ct. App. 2011). On appeal, "this Court reviews the chancellor's equitable division of the parties' marital estate under the familiar manifest-error standard of review." *Mosher v. Mosher*, 192 So. 3d 1118, 1124 (¶22) (Miss. Ct. App. 2016) (citing *Anderson v. Anderson*, 174 So. 3d 925, 929 (¶8) (Miss. Ct. App. 2015)).

*Tahoe and Jeep Grand Cherokee Debts*

¶59. Scott first challenges the inclusion of the Tahoe debt as marital debt. The classification of the Tahoe debt, however, depends on an understanding of the events surrounding the Jeep Grand Cherokee that the parties owned during the marriage and why Lana later purchased the Tahoe. On June 27, 2022, the chancellor held a temporary hearing and set that day as the date of demarcation for the accumulation of marital assets and debt of the parties. The court also awarded Lana the use and possession of the Jeep Grand Cherokee, a marital asset, and required her to pay the monthly note owed to Ally Financial (Ally) and maintain insurance. The account with Ally was in Scott's name alone. Thereafter, when Lana failed to make the monthly payments, Ally repossessed the Jeep and sold it in December 2022. However, the sale did not pay off the balance, and there remained a deficiency owed of $19,628.07.

27

¶60. Scott filed a motion for contempt against Lana on this issue, and in her response Lana stated that prior to the separation and divorce action, the Jeep account was paid with an automatic draft on her bank account.[6] Lana alleged Scott had discontinued that automatic payment, and she could not reinstate it. She stated she was forced to remit payment through mailing a check each month and hoped that it would be properly applied to the correct account, or she had to wait on the phone to speak to a customer service representative. But Lana never alleged or testified that she actually mailed any payments or that Ally had misapplied her payments. Nor did she plead or testify that she was financially unable to make the payments. It only became inconvenient, but not impossible, for her to make payments when she could not make them online. Accordingly, the account went into default, and the Jeep was repossessed because of Lana's failure to pay.

¶61. After the Jeep's repossession, and well after the date of demarcation, Lana purchased the Tahoe in her name, incurring a $62,000 debt. In the divorce opinion and judgment, the chancellor only dealt with the Jeep Grand Cherokee in its discussion of the second *Ferguson* factor, i.e., whether either spouse had disposed of a marital asset. There, the court stated that Lana was unable to make the Jeep payment because Scott refused to give her access to the online payment portal. However, the chancellor did not note that Lana admitted that she could make payments by mail or by phone. The chancellor then considered the Tahoe debt as marital debt but did not list or value the vehicle as a marital asset that Lana retained. The

---

[6] However, the record reflects that after they were married, Lana paid everything through her business bank accounts. The parties testified that they decided to purchase the Jeeps (a Grand Cherokee and a Rubicon) new because of the travel between the stores.

court also listed the deficiency owed to Ally on the Jeep Grand Cherokee as a marital debt, but the court did not enter the *amount* of the deficiency on its chart of marital debt and include that amount in its overall calculations. Instead, later in its contempt findings, the chancellor found it "equitable" that both parties split the Ally deficiency debt and calculated Lana's share as $9,818.45.

¶62. The record in this case does not support the chancellor's findings concerning the Jeep Grand Cherokee's repossession and deficiency or concerning the Tahoe and its financial obligation. Because the Tahoe was purchased and solely owned by Lana well after the date of demarcation, it was Lana's separate, not marital, property, and the debt owed on it was not marital debt but a separate obligation incurred solely by Lana.

¶63. Moreover, the chancellor erred in failing to hold that Lana had dissipated a marital asset (the Jeep Grand Cherokee) when she failed to make payments on it as ordered. Lana knew that she was not limited to making payments on the Jeep through automatic drafts on her account or online and that she could make them by mail or by phone. She never claimed to be financially unable to make the payments, nor did she seek the court's approval to stop making payments as ordered and secure another vehicle. Lana's unilateral actions resulted in the loss of the Jeep and a dissipation of a marital asset. *See Knight v. Knight*, 195 So. 3d 895, 901-02 (¶22) (Miss. Ct. App. 2016) (listing husband's failure to pay the mortgage as required in a temporary order, which resulted in the home's foreclosure, as one of several actions by the husband that constituted dissipation of assets).

¶64. Accordingly, we find that the chancery court was manifestly wrong in not finding that

29

Lana had dissipated a marital asset (the Jeep Grand Cherokee) and in considering the Tahoe debt a marital debt. On remand, in its revision of the equitable division of the marital property, the chancery court should consider the Tahoe as Lana's separate property and the Tahoe debt as non-marital debt. Further the court should hold Lana responsible for the full deficiency of $19,628.07 owed to Ally on the Jeep. In addition, neither the Ally deficiency debt nor the Tahoe debt should be included in the calculation of the total marital debt.

*Overall Division of Assets and Debts*

¶65.    Scott argues that the chancery court erroneously assigned him a disproportionate (77%) share of the marital debt. Lana counters that the chancellor did not err because Scott was allocated a disproportionate share of the parties' assets, especially if the court had considered the appraised value of the home, $350,000.

¶66.    Before we can determine if the chancery court manifestly erred in its division of the marital estate, we must determine if the court correctly identified the marital assets and marital debts. We have already noted the court's error in including the Tahoe and Ally debts as marital.[7] From our review of the record, we note other errors in the chancery court's chart of marital assets and debt, including, first, the court did not list a value for the Jeep Rubicon although Scott testified that he paid $58,000 or $60,000 for it. In addition, the court listed the outstanding loan on that vehicle owed to Chrysler Capital as $49,396, when Scott reported the balance on his February 2024 Rule 8.05 financial statement as $43,740.75. Prior

---

[7] We also note that Lana listed the outstanding balance owed on her last Rule 8.05 financial statement (February 2024) as $53,978.48, not $62,000 as the chancery court has listed.

to that, in Scott's June 2022 Rule 8.05 financial statement, the balance on the Rubicon was $56,034.18. Lana did not include the vehicle on her financial statements and neither party presented any testimony on the debt. So it is unclear what the chancery court used to set the amount at $49,396. Second, the court did not include or value the 2014 Audi Q7 on the list of marital assets although the court included an outstanding loan amount of $8,000 as a marital debt. In her May 2022 Rule 8.05 financial statement, Lana listed a 2014 Audi as a vehicle owned by the parties. She listed no value for it but stated that the loan balance on this vehicle was $8,000. Lana did not include this vehicle on her February 2024 financial statement and Scott did not list it on either of his financial statements. Neither party testified about this vehicle, its value, or any loan balance. With such little information in the record about when this vehicle was purchased, and if the parties even still had it at the time of the final hearing, it is unclear to us how it should have been classified or whether the debt was still outstanding. The court provided no explanation for its treatment of this vehicle and the debt associated with it.

¶67. We further note that the chancery court valued the home at only the equity the parties held in it, rather than at its appraised value, $350,000. A *Ferguson* factor analysis requires a determination of the fair market value of the assets. *Aron v. Aron*, 832 So. 2d 1257, 1260 (¶14) (Miss. Ct. App. 2002). Both Lana and Scott listed the value of the home as $350,000 on their Rule 8.05 financial statements. Thus, the chancery court should have included the full fair market value in its chart on marital assets, especially since the court included the full amount of the outstanding mortgage.

31

¶68.  Overall, because it is unclear how the chancery court determined what property was marital, and how and why it valued the marital assets as it did, we are unable to determine if the chancellor did, in fact, accomplish the task of complying with the guidelines of *Ferguson*.  Accordingly, we reverse and remand the court's judgment in part concerning the division of the marital property and debt for reconsideration by the chancery court in light of the holdings of this Court.

### III.    Whether the chancellor erred in its contempt findings.

¶69.  Scott challenges the chancery court's holdings and orders concerning the contempt motions filed by the parties concerning the arrearage on the house payments, the repossession and deficiency owed on the Jeep Grand Cherokee account, and the sale of the boat.

*House Payments*

¶70.  On June 27, 2022, the court awarded the use and possession of the home to Lana and ordered her to make monthly payments.  Lana claimed that Scott failed to provide her with the means to access the account and make the payments.  The mortgage entered forbearance from June through December 2022.  In September 2022, Lana filed a motion for contempt against Scott, bringing her difficulty in making payments to the court's attention.  The court heard the motion on January 2, 2023, ordered Scott to pay Lana one payment by March, and ordered Lana to pay the rest of the notes to bring the account current.

¶71.  On April 12, 2023, Scott filed a motion for contempt against Lana because, although he had sent her his one month's mortgage payment, Lana had not brought the account current.  Lana filed a motion to dismiss Scott's contempt motion, asserting that the mortgage

32

account was solely in Scott's name and again asserting that he had blatantly refused to provide her with the needed information to make the lump sum payment to bring the mortgage out of forbearance and that foreclosure had begun. After a pre-trial conference in May 2023, the parties resolved the matter with the mortgage company to stop the foreclosure by securing a HUD loan in the amount of $28,004.95, which was tacked to the end of the mortgage loan so the account could become current. It appears that after May 2023, Lana made the monthly mortgage payments, and what was at issue in the contempt proceedings was the amount she did not pay from June 2022 through April 2023.

¶72.   In its final judgment, the chancery court ruled on Scott's motion for contempt in which Scott argued that Lana was responsible for these eleven months of non-payment that he was now obligated to pay. Although the court found that Lana had a reason for not paying, the court ruled that she still owed the money. The court did not calculate the full amount of the payments owed but, instead, only ordered Lana to pay $9,500 with no explanation of how the court arrived at that amount.

¶73.   We agree with the chancellor that, no matter Lana's reasons, she was in contempt of the court's orders by failing to pay the monthly mortgage payments for the period she had use and possession of the home. She did not argue an inability to pay or any other reason that would support a reduction in the amount she owed. According to the Rocket Mortgage statement entered as an exhibit, the arrearage owed through April 2023 was $22,904.36. The parties arranged a loan with HUD to cover the arrearage, and Rocket Mortgage agreed to tack these payments to the end of the note, which meant they were included in the full mortgage

balance that the court listed as a marital debt and assigned to Scott. If Lana resumed payments after April 2023—there being no evidence to the contrary—Lana then owed that balance for eleven months, for a total of $22,904.36.

¶74. In a similar case, the Mississippi Supreme Court held that a husband owed his ex-wife the full mortgage arrearage when he failed to make the monthly court-ordered payments. *Shumake v. Shumake*, 233 So. 3d 234, 242 (¶27) (Miss. 2017). In that case, when the parties divorced, the mortgage owed to the lender was in arrears. *Id*. at 241 (¶23). The court ordered Mr. Shumake to pay the arrearage and bring the account current. *Id*. He failed to do so and Mrs. Shumake filed a motion for contempt because she had been forced to refinance the home to include the $10,468 arrearage. *Id*. at (¶24). The chancellor rejected Mr. Shumake's argument that he had discharged his portion of the debt in his bankruptcy, and on appeal the Supreme Court affirmed the chancellor's ruling that he still owed Mrs. Shumake the arrearage. *Id*. at (¶27). The Supreme Court held that "[p]lainly, the chancellor's intent was for Mr. Shumake immediately to pay the first mortgage arrearage, and Ms. Shumake would not be responsible for that debt." *Id*. at 242 (¶27). The Court also affirmed the chancellor's order that Mr. Shumake pay his wife the full amount owed because she ended up having to pay the full amount of the debt to the lender. *Id*.

¶75. In the case at hand, Scott is having to pay the full amount ($22,904.36) to the mortgage company for those months Lana did not, a debt that Lana was obligated to pay. Accordingly, the chancellor erred in requiring Lana to pay only $9,500, and not the full amount, to Scott.

*Jeep Grand Cherokee Debt*

¶76. We have already dealt with the Jeep Grand Cherokee issue in our discussion of the accuracy of the marital assets and debts. We reiterate that Lana failed to make the payments as ordered by the court, resulting in the repossession and resale of the Jeep. We find that under these facts, the chancery court erred in requiring Scott to pay any portion of the deficiency. We reverse and remand in part for the court to enter an order requiring Lana to pay the full amount of the deficiency owed.

*Boat*

¶77. Scott argues that the chancellor erred in not sanctioning Lana for her unilateral sale of the boat that was awarded to Scott under the temporary order. Testimony from both parties established that they purchased the boat during the marriage. Thus, the boat was marital property. Per the temporary order, Scott was given use and possession of the boat and was responsible for the payments and insurance. In his June 2022 Rule 8.05 financial statement, Scott indicated that the monthly payment was $435.22 and that $38,652.71 was still owed on the boat. At trial, Lana testified that when Scott failed to make two payments or pay the insurance on the boat, she sold it for the outstanding balance. She testified that she consulted her attorney prior to the sale, but she did not obtain Scott's consent, nor did she obtain the court's permission.

¶78. Neither the temporary order nor the interim order required Lana to do anything about the boat or its payments. Therefore, her actions did not violate any *order* of the court and, thus, could not be the basis of a contempt action. Rather, her unilateral sale of the boat

35

would more appropriately be considered as a possible dissipation of a marital asset. To determine this, we note that Mississippi has no specific test for discerning the dissipation of marital assets. *Brown v. Brown*, 350 So. 3d 1169, 1182 (¶43) (Miss. Ct. App. 2022). In that case, we found it was reasonable to look to whether the assets in question were actually wasted or misused. *Id*. Clearly, in this case, Lana was not unjustly enriched because she did not retain any proceeds of the sale, which were used to pay the balance of the indebtedness owed. Scott submitted no evidence that he was damaged in any way and appears to agree in his brief that the sale of the boat did not negatively impact him.[8] In fact, its sale benefitted both parties by relieving them of a significant debt. Therefore, we find no error by the chancery court in not finding Lana in contempt or sanctioning her for her sale of the parties' boat.

IV. **Whether the chancellor erred in it distribution of the closely held business of the parties.**

¶79. Scott next argues that the chancery court erred in awarding ownership of Stork Secret to Lana and only half of the business valuation him. He contends that he left his career when he married Lana to help build the business and was dependent on Stork Secret for his income thereafter.[9] However, Scott cites no authority or precedent to support his position that he was

---

[8] Scott states in his brief, "While financially, the sale of the boat does not appear to have negatively impact[ed] Scott, Lana's actions were purely self serving."

[9] Scott also contends that the judgment is unclear as to whether the court was awarding Lana only Stork Secret I or both Stork Secret stores. However, the only valuation in the record is the valuation of "Stork Secret LLC," which is Stork Secret I. The testimony in the record showed that Stork Secret II's ownership included a third party and the chancery court correctly included only Stork Secret I as Lana and Scott's marital property.

36

entitled to more than half of the business valuation, and thus he is procedurally barred from raising them on appeal. We have held:

> "Arguments advanced on appeal must contain the contentions of the Appellant with respect to the issues presented and the reasons for those contentions with citations to the authority, statutes, and parts of the record relied on." M.R.A.P. 28(a)(6). Failure to cite authority to support an argument renders an issue procedurally barred. *Read v. S. Pine Elec. Power Ass'n*, 515 So. 2d 916, 921 (Miss. 1987) (citations omitted). Accordingly, we will not consider this issue on appeal.

*Wackenhut Corp. v. Fortune*, 87 So. 3d 1083, 1094 (¶35) (Miss. Ct. App. 2012); *see also Howard Indus. Inc. v. Hayes*, 392 So. 3d 1216, 1234 (¶53) (Miss. Ct. App. 2022) (finding issue procedurally barred when party failed to cite authority in a worker's compensation case), *aff'd*, 376 So. 3d 1201 (Miss. 2023). In the case at hand, because Scott has cited no authority to support his argument, the issue is procedurally barred.

## V.    Whether the cumulative errors of the chancellor warrant a new trial.

¶80.    Scott finally argues that if any single error by the chancellor is not sufficient to warrant reversal, the cumulative effect of the errors requires a new trial. Because we have addressed his issues and reversed in some instances and affirmed others, we find no need to address or utilize the cumulative error doctrine in determining the outcome of his appeal.

## Conclusion

¶81.    Because Scott voluntarily dismissed his fault-based grounds for divorce and proceeded to obtain an irreconcilable differences divorce, on appeal, he waived the issues of the chancery court's denial of his motion to amend his fault-based complaint and the chancery court's alleged refusal to admit evidence of marital misconduct or habitual cruel

and inhuman treatment. Further, the chancellor erred by not finding that the Tahoe is non-marital property and the Tahoe debt and the Jeep Grand Cherokee deficiency owed to Ally are Lana's responsibility alone. Further, because we are unable to determine if the chancellor equitably divided the parties' marital assets and debt, we reverse and remand the property division for further proceedings consistent with this opinion. However, we affirm the chancery court's ruling that Scott be awarded half of the value of Stork Secret I, $5,200.

¶82. Concerning the chancery court's findings of contempt, we reverse the chancery court's ruling that Lana only pay $9,500 on the arrearage of the mortgage payments she failed to pay and remand for the chancery court to enter an order requiring her to repay the full arrearage amount to Scott. We also reverse the chancery court's ruling concerning the deficiency owed on the Jeep Grand Cherokee and remand for the chancery court to enter an order requiring that Lana pay the full amount of the deficiency owed to Ally. We affirm the chancery court's judgment concerning the boat and hold that Lana's sale of the parties' boat did not violate any outstanding court order and did not dissipate a marital asset.

¶83. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND EMFINGER, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

38